

IT IS SO ORDERED.
Signed April 6, 2015

**Arthur S. Weissbrodt**
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 10-55902-ASW |
| NOBEL GROUP, INC., | Chapter 11 |
| Debtor. | |
| NOBEL GROUP, INC., | Adv. Pro. No. 14-05100-ASW |
| Plaintiff, | |
| v. | |
| CATHAY BANK, | |
| Defendant. | |

**MEMORANDUM DECISION RE: DEFENDANT'S MOTION TO DISMISS**

Before the Court is the motion of Defendant Cathay Bank (the "Bank") which is represented by attorney Christopher Crowell, to dismiss Plaintiff's complaint. Plaintiff Nobel Group, Inc. ("Debtor"), represented by attorney Wayne Silver, opposes the motion. This Court issued a Tentative Decision on December 11, 2014 and, at a hearing on the same date, heard arguments of the parties. After considering the parties' arguments and reviewing applicable

case law, for the reasons explained below, the Court grants the motion to dismiss for lack of subject matter jurisdiction.

**I. FACTS**

Debtor's Chapter 11 Plan (the "Plan") was confirmed on February 4, 2014. Prior to confirmation, the Debtor sold the real property at 2585 El Camino Real, Santa Clara, CA (the "Property") and paid off the Bank's filed claim ($3,108,731.73) in full. The Bank's escrow demand of $3,380,105 included approximately $250,000 in default interest charged between November 2009 and August 2011. Debtor disputed the default interest but agreed to pay the entire amount so the sale could close, reserving its right to challenge the additional amounts after the sale, post-confirmation. Debtor reserved $25,000 of sale proceeds as an estimate of attorney's fees and costs the Bank might incur in litigating the dispute regarding the escrow demand. The Plan was confirmed over the Bank's objection on the basis that:

> Cathay Bank's claim in this bankruptcy was paid in full from the proceeds of the sale of the Property. Cathay Bank does not set forth any basis for why the $25,000 that was set aside by the Debtor is subject to the Bank's security interest. There is nothing in the order approving the sale that specifically provides for a lien to attach to any funds in excess of the Bank's claim. Nor has the Bank stated any basis for why Debtor cannot pursue recovery of any overpayment post-confirmation. Confirmation of the plan will not prevent the Bank from pursuing recovery of fees if the Reorganized Debtor litigates the question of the Bank's escrow demand.

(Oral ruling, 1/27/14).

**A. The Plan**

The Plan expressly reserves Debtor's "right to dispute the amount paid and seek a refund of any excess payment, and object to

any amended Proof of Claim filed by CATHAY BANK." (¶ 4.4). The Plan further provides a deadline for objections to claims of 30 days after the Effective Date or 30 days after a proof of claim has been filed and served (¶ 6.3).

Article VIII of the Plan further provides that all causes of action held by Debtor and/or the estate on the petition date shall be transferred to the Reorganized Debtor, including "all claims against Creditors of the Debtor, including claims for overpayment from the sale of the 2585 Property . . . . The Reorganized Debtor shall have all rights to commence and pursue any and all Causes of Action, . . . in any court or other tribunal, including without limitation, in an adversary proceeding filed in the Bankruptcy Court."

Article IX, Retention of Jurisdiction, provides:

> 9.0 The Bankruptcy Court shall retain exclusive jurisdiction of the Proceedings pursuant to the provisions of the Code until the Proceedings are closed and further with respect to the following matters:
>
> 9.1. To classify, allow or disallow Claims, direct distributions under the Plan and adjudicate all controversies concerning classification or allowance of any Claim.
>
> . . . .
>
> 9.4. To liquidate damages or estimate Claims in connection with any disputed, contingent or unliquidated Claim.
>
> . . . .
>
> 9.6. To adjudicate all Claims or controversies arising out of any purchase, sale or contract made or undertaken by the Debtor and/or the Reorganized Debtor during the pendency of the Proceedings.
>
> . . . .
>
> 9.16. Hear and finally adjudicate proceedings initiated before or after the Confirmation Date and/or the Effective Date regarding the prosecution of any

> rights, Claims, Causes of Action or claims for relief held by the Debtor and/or Reorganized Debtor against any party, including but not limited to the recovery of funds paid to Cathay Bank, BBCN Bank and/or the Santa Clara County Tax Collector from the sale of the 2585 Property, and subordination of Claims and Interests.

As set forth above, the Plan clearly envisions that the Debtor and the Bank will litigate the Debtor's claims to the disputed funds in the bankruptcy court. The Bank did not object to any of these Plan provisions. It did not raise any of the current jurisdictional arguments until after the Plan had been confirmed.

The Bank did not file an amended proof of claim. Nevertheless, the parties stipulated to extend the deadline for Debtor to object to the Bank's claim to May 21, 2014. On May 20, 2014, Debtor filed an objection to the Bank's claim. A hearing was scheduled for July 10, 2014, and then continued to September 4, 2014. Prior to the continued hearing, on August 28, 2014, the parties filed a joint status conference statement indicating that Debtor would be filing an adversary proceeding within the next 10 days. The matter was taken off calendar. This adversary proceeding was filed October 2, 2014, approximately one month later.

On August 28, 2014, Debtor's counsel filed a letter in the main case (docket no. 335) stating that the Plan had been substantially consummated and that Debtor had paid $1,520,755 to allowed claims under the Plan. The letter further states: "All administrative, priority, and unsecured claims have been paid under the Plan, and Class 7 Investor Claims have been paid a dividend of approximately 80%." The letter also states that there are two unresolved matters concerning secured creditors, including the dispute with the Bank. At the December 11, 2014 hearing, Debtor's

counsel stated that claims in subordinate classes (i.e., insiders) had not yet been paid.

**B. The Complaint**

The complaint contains three claims: breach of contract, declaratory relief, and objection to claim based on the Bank's charging of approximately $250,000 of default interest on the debt owed to it from November 2009 and August 2011, after the loan had matured and the Property had been placed into receivership, and before the Bank had obtained an order in this case granting relief from stay.

The Complaint alleges:

> 4. In January, 2007 Nobel acquired an undeveloped parcel of real estate located at 2585 El Camino Real in Santa Clara, California (the "Property") to develop as a residential and commercial project. The acquisition was partially financed by a loan from Cathay in the amount of $3.0M dollars secured by the Property (the "Cathay Loan") pursuant to a Business Loan Agreement dated January 12th, 2007 ("Loan Agreement").
>
> 5. In accordance with the Loan Agreement, Nobel executed a Promissory Note in the sum of $3,000,000 ("Note"). Pursuant to the terms of the Note, Nobel was required to make regular monthly payments of all accrued interest beginning on February 20, 2007 until January 20, 2009, when the entire unpaid balance of principal and interest would become due and owing.
>
> 6. As security for the Note, Nobel executed and delivered a Deed of Trust dated January 12, 2007 ("Deed of Trust") to Cathay whereby Nobel granted all of its right, title and interest in the Property to Cathay.
>
> 7. On or about January 27, 2009, Cathay and Nobel entered into a Loan Extension Agreement and Modification of Note ("Extension Agreement"), pursuant to which, among other things, the Parties extended the maturity date of the Note until March 31, 2009.
>
> 8. On or about May 19, 2009, Cathay and Nobel entered into a Change in Terms Agreement ("Change in Terms Agreement") that: (1) extended the Maturity Date of the Note to July 31, 2009; (2) changed the interest rate

to be applied to the unpaid principal on the Note to .750% over the Bank's Index Rate; and (3) changed the interest rate floor under the Note. The Loan Agreement, Deed of Trust, Extension Agreement and Change in Terms Agreement are collectively referred to as the "Cathay Loan Documents".

9. The Cathay Loan matured on July 31, 2009 and Cathay refused to either refinance or further extend the maturity date, instead choosing to file Santa Clara Superior Court Action No. 109-CV157962 titled Cathay Bank v. Nobel Group, Inc. (the "Cathay Bank Action"). Cathay requested and obtained a receiver in the Cathay Bank Action to collect the rents and manage the Property. Cathay also commenced a non-judicial foreclosure sale against the Property, and the sale date was scheduled for June 8, 2010. Nobel's Chapter 11 filing on the Petition Date stayed the Cathay Bank Action and prevented the Property from being lost to foreclosure.

10. Cathay filed a Proof of Claim in the Nobel bankruptcy case in the amount of $3,108,731.73 designated as Claim No. 19 (the "Cathay Claim").

11. Cathay moved for relief from stay to allow it to pursue the Cathay Bank Action and foreclose on the Property. The matter was settled during trial and Nobel and Cathay (referred to as the "Parties") worked out a modified loan calling for monthly payments of $14,502 for the first six (6) months, and escalating to $18,432 for the remainder. Interest was to continue at the "non-default rate", and the Parties were to bear their own costs and attorneys' fees incurred after the Petition Date. The Order on Cathay Bank's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C §362(d)(2) was entered on October 31, 2011. Nobel is informed and believes that Cathay never advised Nobel it was accruing default interest at any time prior to the entry of that Order.

12. Nobel sold the Property to Silicon Sage Builders, LLC ("SSB") (formerly known as "Silicon Valley Builders") for $6.1M, free and clear of liens and claims, which were to be paid through escrow. The Purchase and Sale Agreement ("PSA") called for an initial non-refundable deposit of $1.0M, a portion of which was used to bring all payments to Cathay current. Escrow was to close upon the earlier of 30 days from final approval of the Tentative Map, or one year from the Sale Order. The Sale Order was entered on November 16, 2012.

13. Escrow closed on October 8, 2013 upon SSB obtaining the requisite entitlements for the Property. Cathay made a $3,380,105 escrow demand, a copy of which is attached as Ex. 1. Nobel disputed the amount of Cathay's demand to the extent it included approximately

$250,000 in default interest between November, 2009 and August, 2011, however Cathay refused to reduce its demand. Rather than jeopardize the sale of the 2585 Property, Nobel agreed Cathay could be paid the full amount it demanded from sale, and reserved the right to: (1) dispute the amount paid; (2) seek a refund of any excess payment once the Plan was confirmed; and (3) object to any amended Proof of Claim filed by Cathay.

14. Cathay was paid the full amount [of] its demand through escrow. A copy of the Closing Statement is attached as Ex. 2. Nobel segregated and reserved $25,000 from the proceeds of the sale of the 2585 Property, which sum represents an estimate of attorneys' fees and costs Cathay may be entitled to as a result of this dispute, in the event Nobel is unsuccessful and Cathay is entitled to attorneys' fees.

With respect to the First Claim for Relief for Breach of Contract, the Complaint further alleges:

16. The Note states the following with respect to default interest:

*"Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin (Default Rate Margin). The Default Rate Margin shall also apply to each succeeding interest rate charge that would have applied had there been no default."*

17. The Change in Terms Agreement states the following with respect to interest:

*"2. The interest rate to be applied to the unpaid principal balance of the Note will be at a rate of 0.7500 percentage points over the index effective upon the completion of this transaction."*

18. Cathay breached the Note by charging the Default Rate Margin because:

• The Change in Terms Agreement waived the Default Margin Rate. Nobel did not agree or consent to the payment of the Default Rate Margin in addition to .7500 percentage points over the index.

• Nobel was not aware that Cathay secretly intended to collect interest at the Default Rate Margin in addition to .7500 percentage points over the index. Cathay's misconduct precludes it from recovering default interest at the Default Margin Rate.

• Cathay was not entitled to charge the Default Margin Rate on the fully matured Note under California law.

• Cathay was not entitled to collect default interest under Bankruptcy Code § 506(b) because it was undersecured at all times during which the default interest was imposed.

• Imposition of the Default Margin Rate would harm the unsecured creditors.

19. Cathay breached the Note by charging Nobel default interest.

20. Nobel has fully performed all of its obligations under the Note.

21. Nobel has been damaged as result of Cathay's breach of the Note in the amount of the default interest paid through the escrow of the sale of the Property.

22. Nobel has further been damaged to the extent it paid Cathay's attorneys' fees and costs through the escrow of the sale of the Property to which Cathay was not entitled.

The Complaint prays for the following relief: (1) judgment in an amount to be proven at trial for the default interest and attorneys' fees paid to Cathay in connection with its escrow demand; (2) a declaration that Cathay was not entitled to default interest or attorneys' fees and an order of restitution of the amounts overpaid; (3) an order sustaining Nobel's objection Cathay's claim; and (4) costs and attorneys' fees.

**C. Motion to Dismiss**

The Bank moves to dismiss the Complaint in its entirety for lack of subject matter jurisdiction. Alternatively, the Bank asks the Court to abstain from hearing the claims. The Bank also seeks dismissal of the second and third claims (for declaratory relief and objection to claim) on the grounds that those claims are duplicative of the breach of contract claim. With respect to the

claim for declaratory relief, the Bank also asserts that Debtor may not seek restitution where a valid express contract covers the subject matter of the dispute. Regarding the third claim for objection to claim, the Bank asserts that the claim is time-barred.

The Bank also contends that the Court should decline to exercise supplemental jurisdiction over the first and second claims for relief, and should permissively abstain from hearing the entire case.

## II. ANALYSIS

Post-confirmation bankruptcy court jurisdiction is limited to matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan. In re Resorts Int'l, Inc., 372 F.3d 154, 168-69 (3d Cir. 2004). This so-called "close nexus" test has been adopted and applied in the Ninth Circuit. In re Pegasus Gold Corporation, 394 F.3d 1189, 1194 (9th Cir. 2005); In re Wilshire Courtyard, 729 F.3d 1279, 1287 (9th Cir. 2013). "The close nexus test recognizes the limited nature of post-confirmation jurisdiction but retains a certain flexibility." Pegasus Gold, 394 F.3d at 1194. The close nexus test requires "particularized consideration of the facts and posture of the each case, as the test contemplates a broad set of sufficient conditions and retains a certain flexibility." Wilshire Courtyard, 729 F.3d at 1289.

In Resorts Int'l, the Court of Appeals for the Third Circuit examined the extent of a bankruptcy court's post-confirmation jurisdiction. The court noted that after confirmation of a reorganization plan, retention of bankruptcy court jurisdiction may

be problematic. This is because once a plan is confirmed, the debtor-in-possession becomes the reorganized debtor, and, as a general rule, the bankruptcy estate ceases to exist. Therefore, the traditional test for "related to" jurisdiction – whether the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy – could not be met. <u>Resorts Int'l</u>, 372 F.3d at 164-65 (citing <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984, 994 (3d Cir. 1984)).

> But courts do not usually apply <u>Pacor</u>'s "effect on the bankruptcy estate" test so literally as to entirely bar post-confirmation bankruptcy jurisdiction. As the District Court correctly noted, though the scope of bankruptcy court jurisdiction diminishes with plan confirmation, bankruptcy court jurisdiction does not disappear entirely. Post-confirmation jurisdiction is assumed by statute and rule: 11 U.S.C. § 1142(b) authorizes the bankruptcy court to "direct the debtor and any other necessary party ... to perform any other act ... that is necessary for the consummation of the plan," and Fed. R. Bankr.P. 3020(d) provides that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Although § 1142(b) assumes that post-confirmation jurisdiction exists for disputes concerning the consummation of a confirmed plan, 28 U.S.C. § 1334 remains the source of this jurisdiction.

<u>Resorts Int'l</u>, 372 F.3d at 165 (citations omitted).

Because bankruptcy court jurisdiction is conferred by statute, parties to litigation cannot confer subject matter jurisdiction where none exists.

> Retention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction. But neither the bankruptcy court nor the parties can write their own jurisdictional ticket. Subject matter jurisdiction "cannot be conferred by consent" of the parties. Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement, even in a plan of reorganization. Similarly, if a court lacks jurisdiction over a dispute, it cannot create that jurisdiction by simply stating it has jurisdiction in a confirmation or other order. Bankruptcy courts can only act in proceedings within their jurisdiction. If there is no jurisdiction under 28 U.S.C.

> § 1334 or 28 U.S.C. § 157, retention of jurisdiction provisions in a plan of reorganization or trust agreement are fundamentally irrelevant. But if there is jurisdiction, we will give effect to retention of jurisdiction provisions.

Resorts Int'l, 372 F.3d at 161 (citations omitted). See also In re Captain Blythers, Inc., 311 B.R. 530, 538 (9th Cir. BAP 2004), aff'd, 182 Fed. Appx. 708 (9th Cir. 2006); In re 350 Encinitas Investments, LLC, 2007 WL 2669546, at *6 (S.D. Cal. Sept. 6, 2007), aff'd, 313 Fed. Appx. 70 (9th Cir. 2009); United States v. Bond, 762 F.3d 255, 261 (2d Cir. 2014); In re Washington Mutual, Inc., 2012 WL 4755209 (Bankr. D. Del. Oct. 4, 2012) (citing Resorts Int'l, 372 F.3d at 169; In re BWI Liquidating Corp., 437 B.R. 160, 166 (Bankr. D. Del. 2010); In re The Fairchild Corp., 452 B.R. 525, 532 (Bankr. D. Del. 2011)); Quincy Medical Center v. Gupta, 2015 WL 58633, at *4 (D. Mass. Jan. 5, 2015); In re Angel Fire Corp., 2012 WL 5880675, at *4-5 (Bankr. D.N.M. Nov. 20, 2012) (citing Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982) (holding that no action of the parties can confer subject matter jurisdiction upon a federal court, thus the consent of the parties is irrelevant)).

Although the question of subject matter jurisdiction is to be decided on the basis of the facts and circumstances of each case, Wilshire Courtyard, 729 F.3d at 1289, it is helpful to examine the cases to get a sense of the circumstances under which courts have analyzed whether a bankruptcy court had post-confirmation jurisdiction. The Court has reviewed a number of these cases. As a general rule, the cases where a close nexus was found involved a situation where resolution of the dispute would require the bankruptcy court to interpret or enforce a provision of the

confirmed plan. See, e.g., Pegasus Gold, 394 F.3d at 1194 ("Resolution of these claims will likely require interpretation of the Zortman Agreeement and the Plan."); Wilshire Courtyard, 729 F.3d at 1289 ("the ultimate merits question depends in part on the interpretation of the confirmed Plan."). Additionally, in Wilshire Courtyard, the resolution of the claims required application of a federal bankruptcy statute, 11 U.S.C. § 346. Id. at 1290-91.

Cases where courts found that the close nexus test was not met include Resorts Int'l. There, nearly seven years after confirmation of the plan, the trustee of a litigation trust formed pursuant to the confirmed plan filed a malpractice claim against the accountants for the litigation trust. In determining that the bankruptcy court lacked subject matter jurisdiction over the dispute, the Third Circuit Court of Appeals held that

> the resolution of these malpractice claims will not affect the estate; it will have only incidental effect on the reorganized debtor; it will not interfere with the implementation of the Reorganization Plan; though it will affect the former creditors as Litigation Trust beneficiaries, they no longer have a close nexus to bankruptcy plan or proceeding because they exchanged their creditor status to attain rights to the litigation claims; and as stated, the jurisdictional retention plans cannot confer jurisdiction greater than that granted under 28 U.S.C. § 1334 or 28 U.S.C. § 157.

Resorts Int'l, 372 F.3d at 169.

In In re Valdez Fisheries Dev. Ass'n, Inc., 439 F.3d 545 (9th Cir. 2006), the Court of Appeals found that the close nexus test was not met where the post-dismissal determination of liability between a creditor and the state of Alaska "could not conceivably alter the debtor's rights, liabilities, options, or freedom of action or in any way impact upon the handling and administration of the bankrupt estate." Id. at 547-48.

The retention of jurisdiction provisions in the Plan clearly indicate that the parties intend and agree to resolve the instant dispute in this Court. Additionally, the Plan expressly provides for recovery of the alleged overpayment to the Bank and provides that the Plan will be funded in part through recoveries on "Causes of Action," which includes the instant claims. However, under the authorities cited above, these provisions do not confer jurisdiction over this dispute in the bankruptcy court. Indeed, they can be given little weight, as they are only effective if the bankruptcy court has jurisdiction in the first instance.

The Court finds that the resolution of this dispute does not affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan. First, the issues in the adversary proceeding do not require the Court to interpret the plan. Second, by the Debtor's own admission, the Plan has been substantially consummated, notwithstanding the fact that subordinated classes have yet to be paid. Third, the issues in the adversary proceeding arise solely under state law. Despite Debtor's characterization of its third claim for relief as an objection to claim, there is no claim to object to. The Bank's filed claim has been paid in full; the Bank never amended its claim. As far as the bankruptcy estate is concerned, the Bank's claim no longer exists.

The Debtor's Plan has not been fully consummated. This Court has found no cases that illuminate exactly what level of "consummation" or "execution" would suffice to confer subject matter jurisdiction. The only way the Court could find a close nexus exists in this case is through a broad interpretation of those terms, which is not supported in the existing case law.

Because the Plan provides for partial funding via any funds recovered from the lawsuit between Debtor and the Bank, this reasonably could be construed as part of the consummation or execution of the Plan. However, the recovery of overpayment to the Bank is not a primary or major component of the Plan. Additionally and importantly, the Ninth Circuit has made clear that even if a dispute could potentially increase recovery to creditors, that is not a basis for finding that this Court has subject matter jurisdiction. <u>Pegasus Gold</u>, 394 F.3d at 1194 n.1 ("[W]e are not persuaded . . . that jurisdiction lies because the action could conceivably increase the recovery to creditors. . . . such a rationale could endlessly stretch a bankruptcy court's jurisdiction.") (citing <u>Resorts Int'l</u>, 372 F.3d at 170; <u>In re Craig's Stores of Texas, Inc.</u>, 266 F.3d 388, 391 (5th Cir. 2001)).

For these reasons, the Court finds that under the close nexus test, this Court lacks jurisdiction over the claims in this adversary proceeding. This is not a situation where this Court has any discretion in the matter. Therefore, the Court need not address the Bank's remaining arguments.

Counsel for the Bank may submit a proposed form of order dismissing the adversary proceeding.

**\*\*\* END OF MEMORANDUM DECISION \*\*\***

**Court Service List**

Parties to be served electronically.